**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW BOYD and CHRIS MITRO, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br> **v.**<br><br>GUNBROKER.COM,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMAND |

Plaintiffs Andrew Boyd and Chris Mitro, on behalf of themselves and all others similarly situated, complain and allege upon information and belief based, among other things, upon the investigation made by Plaintiffs and through their attorneys as follows:

<u>**NATURE OF ACTION**</u>

1. This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant Gunbroker.com ("Gunbroker.com"), arising from Defendant's deceptive and undisclosed addition of 1% "Compliance Fees" to all purchases.

2. GunBroker.com is the largest online firearms marketplace in the U.S., allowing gun owners and dealers to sell their firearms for a set price or in an online auction.

3. In or around 2022, Gunbroker.com began adding a 1% hidden Compliance Fee to the total cost of all orders. Gunbroker.com adds this fee to orders without informing consumers it would be added until <u>after</u> a consumer won an auction or otherwise decided to purchase a firearm.

4. Even then, on the final checkout screen, Gunbroker.com hides the existence of the hidden Compliance Fee in a line item called "Taxes/Fees," ensuring that consumers cannot even

learn of the fee without further effort and misleading consumers into believing that the add-on fee is some kind of government-imposed levy when it is not.

5.     Moreover, the fee itself is a sham, a classic example of a so-called "junk fee." Gunbroker.com's central service is to provide a marketplace for guns in compliance with applicable laws. That lawfulness is a service that sellers on the site already pay handsomely for, forfeiting a significant portion of all sales to Gunbroker.com. Further, Gunbroker.com is not even responsible for a given sale's compliance with state and local laws. Rather, and as described herein, the company offloads that responsibility to Federal Firearms License holders.

6.     The fee is also entirely mis-named, and is not a pass through "compliance" cost consumers as represented. Indeed, because the hidden Compliance Fee is assessed as a percentage of all sales, more expensive guns incur a much higher fee than less expensive guns. But it does not cost Gunbroker.com any more to ensure legal compliance for a $4,000 gun than it does to ensure legal compliance for a $400 gun. The fee is not for "compliance," it is for profit.

7.     Other gun marketplaces operate freely and fairly without such add-on fees, and Plaintiffs would have chosen to use such other outlets if they had known the truth about Gunbroker.com's practices.

8.     Plaintiffs and other class members were duped into paying hidden Compliance Fees and were injured by Defendant's practices. Plaintiffs bring this action on behalf of themselves, the putative Class and subclasses, and the general public. Plaintiffs seek actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Defendant from continuing to engage in its illegal practices described herein.

2

## PARTIES

9.    Plaintiff Andrew Boyd is a citizen and resident of Hanover Park, Illinois.

10.    Plaintiff Christopher Mitro is a citizen and resident of Orient, Ohio.

11.    Defendant Gunbroker.com Corporation maintains its principal business offices in Kennesaw, Georgia.

## JURISDICTION AND VENUE

12.    This Court has original jurisdiction of this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Illinois; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## COMMON FACTUAL ALLEGATIONS

**A.    Plaintiffs Did Not Agree to Terms of Service When They Signed up for the Website**

14.    Plaintiff Boyd registered for Gunbroker.com in April, 2022. At the time Plaintiffs Boyd registered for the service, he was not affirmatively presented with and did not assent to terms of service or a user agreement for use of the site.

15.    Plaintiff Mitro registered for Gunbroker.com in or around 2010. At the time Plaintiffs Boyd registered for the service, he was not affirmatively presented with and did not assent to terms of service or a user agreement for use of the site.

**B.** **Defendant Surreptitiously Adds the hidden Compliance Fee to Consumers Carts, and Intentionally Names and Designs It to Look Like a Government Imposed Fee**

16.     Defendant displays various firearms listings on its websites that customers can browse.

17.     The listings, in general, state the purchase-now price or current auction price for the item, and also the shipping and/or credit card fees that may apply. However, the listings make no mention whatsoever of the add-on hidden Compliance Fee that consumers will be forced to pay. This means that, at the time that consumers decide to make bids on firearms or decide to purchase a firearm, they are not aware of the fact that they will be assessed a hidden Compliance Fee.

18.     Consumers like Plaintiffs win auctions and are surprised to learn, only after they have been declared the winner of a given auction, that they will be assessed a hidden Compliance Fee.

19.     This is a classic case of "drip pricing." Drip pricing is a pricing technique in which companies advertise only part of a product's price and reveal other charges later as the customer goes through the buying process.

20.     "Drip pricing" works because as research has shown, "our brains tend to fix on the price we first encountered even after we learn the total cost. And even when consumers learn about the hidden fees, they often pay up rather than shop around . . .  because they figure that 'investing more time into searching for it will not be worthwhile.'" Santul Narkar, *It's a Great Deal, Before the 'Drip Pricing*,     New     York     Times,     available     at

https://www.nytimes.com/interactive/2024/02/23/business/what-is-drip-pricing.html        (quoting

Professor David Friedman of Willamette University).

21.     Reasonable consumers like Plaintiffs could not understand or expect that an

additional hidden Compliance Fee will be added to their purchase.

22.     This means that many consumers do not notice that an additional fee is being added

to their order. Others believe that they have no choice but to pay this fee. And others still notice

the previously undisclosed fee, but decide to go through with the purchase anyway because they

have already invested substantial time and effort inputting their information into the Defendant's

system and have already made the decision to buy the given product. So, it doesn't make sense to

start over and research whether there may be some other way to avoid the fee. There is no incentive

to reverse course—there is only an incentive to pay the fee, be done with it, and avoid the burden

of finding a way to avoid the fee, if the consumer can even figure out how to avoid the fee at all

after navigating Defendant's checkout process. The deceptive checkout practice has done its job

and diverted the sale to Defendant.

23.     By unfairly obscuring its charges to consumers, Defendant deceive consumers and

gain an unfair upper hand on competitors.

24.     Further enhancing the deception, both the name and manner in which the fee is

displayed is designed to give consumers the impression that the hidden Compliance Fee is an

unavoidable government-imposed fee or tax.

25.     Here is how the scheme works. ***First***, Gunbroker.com hides the existence of the

hidden Compliance Fee in a line item called "Taxes/Fees" on the final checkout screen, ensuring

that consumers cannot even learn of the fee without further effort and misleading consumers into

believing that the add-on fee is a some kind of government-imposed levy when it is not.

26.     By grouping the hidden Compliance Fee in the same bucket as other fees that are required by law (including taxes), Defendant impress upon consumers that the government has mandated that consumers pay such a fee. This is false.

27.     Further, by adding the hidden Compliance Fee late in the checkout process alongside *actual* government-imposed taxes, Defendant give the impression that the hidden Compliance Fee is a government-imposed tax or fee that consumers are required to pay by law.

28.     Thus, Defendant misrepresents that the hidden Compliance Fee is a government-imposed fee similar to a tax or bag fee when it is no such thing.

29.     It was Defendant's choice alone to charge the hidden Compliance Fee and pass its own obligations on to consumers, such as they are, in a deceptive manner as described herein.

30.     ***Second***, the fee itself is a sham, a classic example of a so-called "junk fee." Gunbroker.com's central service is to provide a marketplace for guns in compliance with applicable laws. That lawfulness is a service that sellers already pay handsomely for, forfeiting a significant portion of all sales to Gunbroker.com to ensure, among other things, legal compliance of transactions. Further, Gunbroker.com is not even responsible for a given sale's compliance with state and local laws.

31.     Rather, the company offloads that responsibility to holders of Federal Firearms Licenses ("FLLs"), which is required for the transfer of firearms between individuals. Because most sellers on Gunbroker.com do not have FLLs, the site requires *buyers* to find an FFL dealer to receive the firearm and facilitate the transfer—and pay the FLL holder yet another fee for doing so. In other words, because buyers are paying the FLL holder handling their purchases for "compliance," the FLL is ultimately responsible for all compliance requirements, not Gunbroker.com. Indeed, the FLL holder is the entity responsible for collecting sales tax,

background check fees, or other transfer-related fees—not Gunbroker.com. For this reason as well, the Gunbroker.com hidden "compliance" fee is a sham.

32.     **Third**, the fee is entirely mis-named, and is not a pass through "compliance" cost as represented. Indeed, because the hidden Compliance Fee is assessed as a percentage of all sales, more expensive guns incur a much higher fee than less expensive guns. But it does not cost Gunbroker.com any more to ensure legal compliance for a $4,000 gun than it does to ensure legal compliance for a $400 gun. The fee is not for "compliance," it is for profit.

**C.      The hidden Compliance Fee is a Junk Fee That Violates Federal Guidance**

33.     Defendant's hidden Compliance Fee is precisely the type of "Junk Fee" that has come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, March 5, 2024, available at https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/#_ftnref3.

34.     As the Federal Trade Commission said recently in its effort to combat Junk Fees,

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

Federal Trade Commission, *FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees*, October 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

35.     In July 2024, California expanded its Consumer Legal Remedies Act ("CLRA") to make illegal "drip pricing," which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service. California Civil Code Section 1770(a)(29). Under the new California law, it is now illegal to advertise a low price for a product, only for that product to be subject to additional or mandatory fees later.

36.     In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising," the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart." *See* Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

37.     Defendant violates federal guidance by adding the hidden Compliance Fee as a line item after the consumer "add[s] to shopping cart." The hidden Compliance Fee itself is a sham, a classic "junk fee."

**D.     Plaintiff Boyd's Experience**

38.     In 2022, Plaintiff Boyd purchased various firearms through Gunbroker.com, after having won an auction to purchase the firearms.

39.     Plaintiff was not informed of the mandatory hidden Compliance Fees during the bidding and checkout process.

40.     For example, during the last screen before purchase of a 9mm handgun, Plaintiff was merely presented a line item stating "Taxes/Fees" in the amount of $44.

41.     Hidden within, Defendant charged Plaintiff Boyd an undisclosed hidden Compliance Fee in the amount of $5.49.

42.     Had Defendant reasonably and fairly disclosed the hidden Compliance Fee, Plaintiff Boyd would have made a different choice with respect to whether to use Defendant for his firearms purchase.

### E.     Plaintiff Mitro's Experience

43.     During 2025, Plaintiff Mitro purchased various firearms through Gunbroker.com, after having won an auction to purchase the firearms.

44.     Plaintiff was not informed of the mandatory hidden Compliance Fees during the bidding and checkout process.

45.     For example, during the last screen before purchase of a WWII-era weapon, Plaintiff was merely presented a line item stating "Taxes/Fees" in the amount of $14.75. But *there were no taxes assessed by Gunbroker.com on this purchase*—the entirety of this line item was a hidden Compliance Fee.

46.     Defendant charged Plaintiff Mitro an undisclosed hidden Compliance Fee in the amount of $14.75.

47.     Had Defendant reasonably and fairly disclosed the hidden Compliance Fee, Plaintiff Mitro would have made a different choice with respect to whether to use Defendant for his firearms purchase.

## CLASS ALLEGATIONS

48.     Pursuant to Rule 23, Plaintiffs bring this action on behalf of themselves and a Class of similarly situated persons defined as follows:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, placed an order through Gunbroker.com and paid a hidden Compliance Fee.

49.     Plaintiffs also seek represent an Illinois subclass and an Ohio subclass.

50.     Excluded from the Class are Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff.  Plaintiffs reserve the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

51.     <u>Numerosity</u>:  At this time, Plaintiffs do not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are well into the thousands, and thus are so numerous that joinder of all members is impractical.  The number and identities of Class members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

52.     <u>Commonality</u>:  There are questions of law or fact common to the Class, which include, but are not limited to the following:

> a.     Whether during the class period, Defendant deceptively represented its delivery fees;

      b.     Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

      c.     Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

      d.     Whether Defendant's alleged conduct constitutes violations of the laws asserted;

      e.     Whether Plaintiffs and members of the Class were harmed by Defendant's misrepresentations;

      f.     Whether Defendant were unjustly enriched;

      g.     Whether Plaintiffs and the Class have been damaged, and if so, the proper measure of damages; and

      h.     Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct described herein.

53.    <u>Typicality</u>: Like Plaintiffs, many other consumers purchased from Defendant based on Defendant's representations. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and each Class member was injured by Defendant's false representations. Plaintiffs and the Class have suffered the same or similar injury as a result of Defendant's false, deceptive and misleading representations. Plaintiffs' claims and the claims of members of the Class emanate from the same legal theory, Plaintiffs' claims are typical of the claims of the Class, and, therefore, class treatment is appropriate.

54.    <u>Adequacy of Representation</u>: Plaintiffs are committed to pursuing this action and have retained counsel competent and experienced in prosecuting and resolving consumer class

actions. Plaintiffs will fairly and adequately represent the interests of the Class and do not have any interests adverse to those of the Class.

55.     <u>Prerequisites for Injunctive Relief</u>. Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Plaintiffs remain interested purchasing from Defendant, provided they are actually provided with truthful pricing representations, as promised.

56.     Defendant ongoing and systematic practices make declaratory relief with respect to the Class appropriate.

57.     <u>Prerequisites for Damages</u>. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class member.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Negligent Misrepresentation**
**(Asserted on Behalf of the Class)**

58.     Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

59.     Defendant has negligently represented that the true costs of purchasing firearms or bidding on firearms on its website.

60.     Defendant, had a duty of care to inform customers of the true costs of making firearms purchases, including so-called mandatory hidden Compliance Fees. This is a material fact that was only known by Defendant, but it was never fairly disclosed to consumers.

61. Defendant made misrepresentations of material fact that were false.

62. Defendant knows its misrepresentations about firearms costs are material to the reasonable consumer.

63. Defendant knew and intended that Plaintiffs and members of the Classes would rely upon their misrepresentations when deciding whether or not to purchase firearms from Defendant.

64. Defendant was negligent because it knew or should have known that its representations in marketing materials about the cost of firearms purchases are inaccurate and misleading.

65. Defendant omitted the fact that as a matter of secret policy, hidden Compliance Fees were added at the last minute, without fair disclosure.

66. Plaintiffs and members of the Classes justifiably acted in reliance upon Defendants' false and misleading statements.

67. Neither Plaintiffs nor any reasonable consumer would have made firearms purchases they could have made elsewhere if they had known of the true cost of it--a cost Defendant alone was aware of and actively misrepresented.

68. As a direct and proximate result of Defendant's misrepresentations, Plaintiffs and members of the Classes were induced into making purchases with mandatory hidden Compliance Fees, and have been harmed and suffered actual damages in the amount of hidden Compliance Fees paid.

69. Plaintiffs seek all available remedies, damages, and awards as a result of Defendant's negligent misrepresentations.

SECOND CLAIM FOR RELIEF
CAUSE OF ACTION
Violation of Georgia's Unfair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.*
(Asserted on Behalf of the Class)

70.    Plaintiffs incorporate by reference and realleges herein all paragraphs alleged above.

71.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]fair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

72.    In the course of its business, Defendant, through its agents and/or employees, violated the Georgia FBPA.

73.    By marketing, offering for sale, and selling firearms, Defendant engaged in one or more of the following unfair or deceptive acts or practices as defined in Ga. Code Ann. § 10-1-393(b): 1) "[r]epresenting that goods or services have . . . characteristics, uses, benefits, or quantities that they do not have[;]" 2) "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another;" and 3) "[a]dvertising goods or services with intent not to sell them as advertised[.]"

74.    Defendant's scheme and concealment of the true characteristics of the firearms purchases were material to Plaintiffs and the other Georgia Class members' as Defendant intended. Had they known the truth, Plaintiffs and the other Georgia Class members would not have purchased the Products or would have paid significantly less for them.

75.    Plaintiffs and the other members of the Georgia Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

76.    Defendant had an ongoing duty to Plaintiffs and the other Georgia Class members

14

to refrain from unfair and deceptive practices under the Georgia FBPA in the course of its business. Specifically, Defendant owed Plaintiff and the other Georgia Class members a duty to disclose all of the material facts concerning the firearms' true costs because Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiff and the other members of the Georgia Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

77.     Plaintiffs and the other Georgia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

78.     Defendant's violations present a continuing risk to Plaintiffs and the other members of the Georgia Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

79.     Pursuant to Ga. Code Ann. § 10-1-399, Plaintiff and the other members of the Georgia Class seek an order: 1) enjoining Defendant's unfair and/or deceptive acts or practices; 2) awarding general and punitive damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the Georgia FBPA.

### THIRD CLAIM FOR RELIEF
**Violation of the Illinois Consumer**
**Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.***
**(On behalf of Plaintiff Boyd and the Illinois Subclass)**

80.     Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.

81.     Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of

any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

82.     Section 10a of the ICFA, provides in relevant part:

(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .
. . .

(c) . . . [I]n any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

815 ILCS 505/10A(a).

83.     Plaintiff Boyd and other Class members are "consumers" or "persons," as defined under the ICFA, 815 ILCS 505/1 *et seq*.

84.     Defendant's conduct, as alleged herein, occurred in the course of trade and commerce.

85.     Defendant knowingly and intentionally employed an unfair and deceptive policy and practice by (1) surreptitiously sneaking the Gunbroker.com's hidden Compliance Fee into consumers carts; (2) failing to describe the true nature and purpose of Gunbroker.com's fee; and (3) advertising deceptively low firearms prices that excluded the hidden Compliance Fee.

86.     Defendant also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated IFCA by, *inter alia*, by the conduct stated above.

87.     Defendant statements and omissions were material and were likely to mislead Class members and, in fact, did mislead Class members.

16

88.     Defendant made these statements and omissions with the intent that Class members would rely on them.

89.     As a direct and proximate result of Defendant's conduct, Class members have suffered actual damages.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of the Class)

90.     Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

91.     To the detriment of Plaintiffs and the Class, Gunbroker.com has been, and continue to be, unjustly enriched as a result of its wrongful conduct alleged herein.

92.     Plaintiffs and the Class conferred a benefit on Gunbroker.com when they paid Gunbroker.com the hidden Compliance Fee.

93.     Gunbroker.com unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Gunbroker.com to retain.

94.     Gunbroker.com's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

95.     Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Gunbroker.com as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class seeks judgment in an amount to be determined at trial, as follows:

(a)     For public injunctive relief, enjoining Defendant from continuing the unlawful practices set forth above;

(b)     For declaratory and injunctive relief as set forth above;

17

(c)    For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d)    For compensatory damages according to proof;

(e)    For punitive damages according to proof;

(f)    For reasonable attorneys' fees and costs of suit;

(g)    For pre-judgment interest; and

(h)    Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs hereby demands a jury trial on all claims so triable.

Dated: June 5, 2025

**KALIELGOLD PLLC**

By:*/s/ Jeffrey D. Kaliel*
Jeffrey D. Kaliel
Amanda J. Rosenberg
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielgold.com
arosenberg@kalielgold.com

Sophia Goren Gold
**KALIELGOLD PLLC**
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com

Tyler B. Ewigleben
Christopher D. Jennings
**JENNINGS & EARLY PLLC**
500 President Clinton Avenue
Suite 110
Little Rock, AR 72201
Telephone: (501) 255-8569
tyler@jefirm.com

chris@jefirm.com

*Attorneys for Plaintiffs and the Putative Class*